**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Crim. No. 20-242 (SRN/BRT) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| (1) David Scott Nelson, | |
| Defendant. | |

Bradley M. Endicott, Esq., United States Attorney's Office, counsel for Plaintiff.

James R. Behrenbrinker, Esq., Behrenbrinker Law Firm, counsel for Defendant Nelson.

BECKY R. THORSON, United States Magistrate Judge.

This matter is before the Court following a hearing held on June 2, 2021, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure. (Doc. No. 17.) At the hearing, Special Agent Scott B. Gleason testified,[1] and Defendant's Exhibits 1 through 4 and the Government's Exhibit 1 were received. (*See* Doc. Nos. 64, 65.) Thereafter, the parties filed post-hearing briefs. (Doc. Nos. 69, 70.) The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1.

---

[1]   Gleason is a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and has been employed there since October 2019. (*See* Doc. No. 65, Gov't Hr'g Ex. 1 at Search Warrant Application 1.) Before that, Special Agent Gleason was an officer with the Clayton Police Department in Clayton, Missouri for over ten years. (*Id.*)

For the reasons stated below, this Court concludes that no *Franks* violation occurred and recommends that Defendant's motion be denied.

## BACKGROUND

In July 2020, the Government along with other governmental agencies initiated a firearms and narcotics investigation of Defendant. (*See generally* Gov't Hr'g Ex. 1 at Search Warrant Affidavit.) During surveillance, officers observed Defendant driving a silver 750 BMW vehicle. In July and August 2020, officers[2] heard Defendant discussing criminal activity involving firearms and narcotics during routinely monitored phone calls with inmates in Minnesota Department of Corrections ("DOC") custody. (*Id.* at 4–6.) Defendant's prior convictions made it illegal for him to possess firearms.[3] (*Id.* at 4; Indictment at 1–2.) Based on the information learned during those calls, officers obtained a search warrant for cell site location information on Defendant's cellular telephone.[4] (Search Warrant Affidavit at 6.)

In September 2020, investigators learned of additional calls made by Defendant to inmates in DOC custody wherein he made further statements about firearms and

---

[2]   Specifically, Special Agent Laura Gulick was investigating Defendant, and she requested Special Agent Gleason assist with the case by conducting surveillance on Defendant. (Doc. No. 67, Hr'g Tr. 41.)

[3]   It is undisputed that Defendant's prior convictions and the circumstances around those convictions did not provide a connection between firearms, ammunition, or the distribution of drugs and the Euclid address that is at issue in this motion. (*See* Hr'g Tr. 91.)

[4]   The cell site location warrant is not challenged here by Defendant.

2

narcotics, including a recent encounter where his vehicle was struck by bullets. (*Id.* at 10–11.) The day after these comments were made, on September 11, 2020, Special Agent Gleason located Defendant's vehicle (the silver BMW) in Bloomington, MN, and observed what appeared to be two bullet holes in the rear passenger side of the vehicle. (*Id.* at 11.)

On September 16, 2020, an officer observed the silver BMW parked behind [XXX] Euclid Avenue, St. Paul, Minnesota, although the officer did not observe Defendant at that address that day. (Doc. No. 67, Hr'g Tr. 53–54.) Between September 16 and September 20, 2020, cell site information indicated forty-seven "pings" from Defendant's phone at the Euclid address and the majority of those pings were between 12:00 a.m. and 5:00 a.m., indicating to Special Agent Gleason that Defendant was sleeping at that address. (Search Warrant Affidavit at 6–7.) Special Agent Gleason testified that there were other times during this six-day period that Defendant was observed in the Euclid area; but his affidavit does not reference any times other than September 22, 2020, and at the hearing, Special Agent Gleason could not identify any Report of Investigations ("ROIs") or other writings that might corroborate his statement that there were other surveillance observations of Defendant at the Euclid address between September 16 and September 22, 2020. (Hr'g Tr. 96–97, 99–101.) On September 22, 2020, an officer observed Defendant exit the rear of the [XXX] Euclid Avenue residence, enter a car registered to his known girlfriend, and return to the residence. (Search Warrant Affidavit at 7.) That address was Defendant's girlfriend's registered residence with the Minnesota Department of Vehicle Services. (*Id.*)

Special Agent Gleason testified that ATF agents had conducted physical surveillance on Defendant almost every day Monday through Friday between August 27, 2020 and September 22, 2020, and during that period, it was the cell phone location data that informed and directed where Special Agent Gleason would conduct surveillance. (Hr'g Tr. 45, 83, 122.)

Based on the above information, Special Agent Gleason sought and received a warrant to search the Euclid Avenue residence, and officers executed the search on September 29, 2020. (Gov't Hr'g Ex. 1.) Various rounds of ammunition were found during the execution of the search warrant; Defendant was indicted on October 27, 2020, with one count of Felon in Possession of Ammunition in violation of 18 U.S.C. §§ 922(g)(1), 924(e). (Doc. No. 13, Indictment.)

In a prior motion to the Court, Defendant argued the search warrant application for [XXX] Euclid Avenue contains substantial false statements and sought an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Based on the preliminary showing by Defendant, the Court granted the request, and held the hearing on June 2, 2021. (Doc. Nos. 59, 64.) The Court now considers whether there was a *Franks* violation and Defendant's motion to suppress.

## DISCUSSION

### I. No *Franks* Violation

The Fourth Amendment requires that a search warrant must be supported by probable cause. *Illinois v. Gates*, 462 U.S. 213, 236–39 (1983). "A search warrant may be invalid if the issuing judge's probable cause determination was based on an affidavit

4

containing false or omitted statements made knowingly and intentionally or with reckless disregard for the truth." *United States v. Conant*, 799 F.3d 1195, 1199 (8th Cir. 2015) (quoting *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001)). Such a challenge is referred to as a *Franks* challenge based on the test set forth in the case *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). "To prevail on a *Franks* claim the defendants must show: (1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit; and (2) that the affidavit's remaining content is insufficient to establish probable cause." *Reinholz*, 245 F.3d at 774. "The same analysis applies to omissions of fact. The defendant must show: (1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *Id.*

Defendant contends that Special Agent Gleason's statements that "[Defendant] was living at the [XXX] Euclid residence," and that Defendant "is utilizing this address on Euclid as his primary residence," were made with reckless disregard for the truth.[5] (Doc. No. 69, Def.'s Post Franks Hearing Mem. in Supp. of Mot. 12–13.) Defendant asserts that officers knew "there were at least two additional addresses that Defendant

---

[5] Defendant also asserts that Gleason's statements that (1) "[Defendant] was seen exiting the rear of the building leading him to believe that [Defendant] lives . . . [at the Euclid address] and cohabitates with Ms. Degroat"; and (2) "the Euclid address is the home residence of [Defendant] and his girlfriend," were made in reckless disregard for the truth. (*Id.* at 13 (emphasis omitted).)

5

frequented," but omitted that information from the affidavit.[6] (*Id.* at 16–17.) Defendant contends the assertion that the Euclid Avenue address was Defendant's primary residence

---

[6]    The two addresses that Special Agent Gleason knew that Defendant frequented most other than the Euclid address were (1) a Bailey Road address in Woodbury, MN (which was the address that the vehicle that Defendant had been seen driving—a silver 750 BMW—was registered to, and the address identified through Defendant's cell phone ping data) (Hr'g Tr. 45–46, 49); and (2) a 56th Street address in Inver Grove Heights, MN (which was an address where officers observed Defendant and the BMW at through surveillance). (Def. Hr'g Ex. 2 at 2; Hr'g Tr. 50–51, 77–78, 86.)

Special Agent Gleason testified that he learned that the vehicle Defendant was driving (the silver BMW) was registered to a woman (K.N.) who lived at the Bailey Road residence. (Hr'g Tr. 49.) Agents did conduct surveillance at the Bailey Road residence and did observe Defendant and the silver BMW there. (*Id.*) Special Agent Gleason testified, however, that while they did follow Defendant's cell phone location to the Bailey Road location as well, the cell phone location was only at the Bailey Road location "every once in a while." (*Id.*)

Similarly, Special Agent Gleason testified that they observed Defendant and the BMW at the 56th Street address on one occasion, and that the cell phone location information led them there. (Hr'g Tr. 50.) Special Agent Gleason testified, however, that he learned that the 56th Street address was occupied by a suspected drug dealer and his parents, and his belief was that it was improbable that Defendant was living there rather than with his girlfriend who lived at the Euclid address. (Hr'g Tr. 61.)

Defendant also contends that Gleason knew of two additional addresses affiliated with Defendant: (1) a Western Avenue address in St. Paul, MN (which was the address the Minnesota Department of Corrections – Supervision identified as Defendant's permanent residence, and which was the known address for Defendant's mother) (Hr'g Tr. 79–80; Def. Hr'g Ex. 3 at 1–2) ; and (2) a Galtier Street address in St. Paul, MN (which was the address connected with Defendant's subscriber data for his telephone and was the address identified on Defendant's Minnesota Driver's License). (Hr'g Tr. 83–85; Def. Hr'g Ex. 4 at 4.)

Special Agent Gleason testified that he did conduct surveillance near the Western Avenue residence, but that they never saw Defendant or his vehicle there. (Tr. 48, 81.)

Special Agent Gleason testified that he could not recall whether ATF conducted surveillance at the Galtier Street residence, but that he was certain that ATF never saw Defendant or his vehicle there. (Hr'g Tr. 47, 61.) He stated that he did not visit the

was "critical to a finding of probable cause to support a warrant to search the Euclid residence." (*Id.* at 13.)

"A showing of deliberate or reckless falsehood is not lightly met." *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010) (quotations omitted). Although the Court concluded that Defendant met his initial burden for a *Franks* hearing, the Court, in its determination of whether a *Franks* violation occurred, now has the benefit of Special Agent Gleason's testimony. As before, the exhibits show that there were at least two—and perhaps up to five—other residences that Defendant was either observed at or linked to and could have been his primary residence. (*See* Def. Hr'g Exs. 2, 3, 4.) And, it was confirmed at the *Franks* hearing that the pings referenced in the search warrant affidavit were only a portion of the total pings during the time-period leading up to the warrant.[7]

---

Galtier address because his surveillance activities were directed by the cell phone location information. (Hr'g Tr. 81, 83.)

Special Agent Gleason also testified as follows: "In my training and experience it's - - I believe it's common for people to want to avoid law enforcement or avoid detection if they're engaged in criminal activities. So in order to do so it would be necessary for them to reside at different addresses than the government or readily-available information has for them." (Hr'g Tr. 49.)

[7]    It is not disputed that Defendant's cell phone was pinged every 15 minutes during the entire 24-hour day during this time period; therefore, there were many other pings (if the phone was turned on and receiving a signal) that were at locations other than the Euclid address. (*See* Hr'g Tr. 104–08, 119.) Special Agent Gleason testified that the cell site ping location information included 47 pings at the Euclid address during the six days leading up to September 20, 2020, that "[t]he majority of these pings were between 12:00 a.m. and 5:00 a.m.", and that there are many times when they receive an e-mail with no location information available because the phone may be turned off at that time, leading Gleason to believe that Defendant was sleeping at that address. (Hr'g Tr. 108, 119.) Special Agent Gleason testified that he made that conclusion "based on normal human

7

However, this Court finds that Special Agent Gleason testified credibly that based on "the totality of the entire investigation," it led him to believe that Defendant was living (and sleeping) at the Euclid address during the week leading up to when the warrant affidavit was drafted. (Hr'g Tr. 101.) Special Agent Gleason testified that throughout his surveillance and investigation, Defendant "was at [the Euclid address] or in the immediate area an overwhelming majority of the time." (Hr'g Tr. 51; *see also* Hr'g Tr. 56, 122.) He testified that, "It was apparent to us, based on a review of all of the data we have, whether it be pings or physical surveillance, that [Defendant] was not residing at any other address but there." (Hr'g Tr. 55–56.) He also stated that he did not include the other residences in the warrant affidavit because he "did not believe there was probable cause for there to be evidence of criminal activity at any of the other addresses . . ." (Hr'g Tr. 60.) Therefore, at the time Gleason drafted the affidavit, the statements made about the Euclid residence being Defendant's primary residence or the place where he was living were not statements Gleason knew to be false and the statements were not included in the affidavit with reckless disregard for the truth. *See United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010) ("The test for determining whether an affiant's statements were made with reckless disregard for the truth is whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of this statements or had obvious reasons to doubt the accuracy of the information provided.").

---

behavior [because] [b]etween those times most people are at their residence." (Hr'g Tr. 122–23.)

And neither was it reckless for Special Agent Gleason to leave out information about the other places that were originally considered possible residences for Defendant since at the time the affidavit was drafted, those other places had been ruled out based on the belief (which was supported by the investigation) that the Euclid address was where Defendant was now staying. *See United States v. Finley*, 612 F.3d 998, 1003 (8th Cir. 2010) (explaining that the magistrate judge hearing testimony from the agents involved was sufficient to conclude that there was no evidence to support reckless disregard for the truth even though the affidavit did not include the date in question); *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) (holding that the key issue at *Franks* hearing was "whether Officer Williams reasonably believed the information in the affidavit" and the motion to suppress was denied based on Officer Williams' testimony). Therefore, the Court finds that the first prong of the *Franks* inquiry has not been met. Because the first prong of the *Franks* inquiry is not met, there is not a *Franks* violation and the Court need not proceed to the second prong of the *Franks* test.

## II.     Probable Cause: Four-Corners Review

With no *Franks* violation, and therefore a facially valid warrant, the Court then looks to whether the warrant affidavit established probable cause for the search.

In determining whether probable cause exists, a detached and neutral judge must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [her] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998) ("The standard of probable

cause for the issuing judge is whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (quotations omitted)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. A probable cause determination is based on the totality of the circumstances. *United States v. Morales*, 923 F.2d 621, 623–24 (8th Cir. 1991). Courts should not review search warrants in a hyper-technical fashion. *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006).

"When . . . the issuing court relies solely on an affidavit to determine whether probable cause exi[sts], only the information found within the four corners of the affidavit may be considered." *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003) (quotations omitted). In reviewing the decision of the issuing court, this Court must ensure that the court "'had a substantial basis for . . . conclud[ing] that probable cause exists.'" *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003) (quoting *Gates*, 462 U.S. at 238–39). Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

An affidavit for a search warrant must establish a sufficient nexus between the place to be searched and the illegal items sought to be seized before a warrant may properly issue. *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016). "The requisite nexus between a particular location and contraband is determined by the nature of the

crime and the reasonable, logical likelihood of finding useful evidence." *United States v. Etheridge*, 165 F.3d 655, 657 (8th Cir. 1999).

Defendant argues that the evidence seized from the Euclid residence should be suppressed because the warrant application failed to establish a nexus between the evidence sought and the place to be searched. However, now that this Court has resolved the issue about Defendant's residence, the required nexus is satisfied because the affidavit links the criminal activity to the Defendant and the Defendant to the place where he was residing at the time.[8]

It is undisputed that the affidavit links Defendant to narcotics and weapons activity through the DOC call records, and that the affidavit links Defendant to the Euclid address through surveillance and a number of pings on his cell phone. Defendant's sole argument is that without reference to the Euclid address being Defendant's primary residence, the search warrant affidavit otherwise lacks information linking the alleged criminal activity with that address. As explained above, it was reasonable for the officers to conclude that Defendant *was* living at the Euclid address based on their surveillance and a number of cell phone pings indicating Defendant was at that address, and in particular, at that address during times when you would expect one to be sleeping.

---

[8] The Court agrees that although the affidavit links Defendant to narcotics and weapons activity through the DOC call records and links Defendant to the Euclid Avenue residence through both surveillance and a number of cell phone pings, as Defendant's counsel argues, without reference to the Euclid Avenue address being Defendant's primary residence, the search warrant affidavit otherwise lacks information linking the alleged criminal activity with that address.

11

Special Agent Gleason stated in his affidavit that persons involved in federal drugs, firearms, or ammunition cases, store those items at their residences, in their vehicles, or conceal them on their person and engage in such activity from their residences or vehicles attempting to conceal their dealings from law enforcement. (Search Warrant Affidavit at 2–3.) Special Agent Gleason also testified that, "Based on my training and experience, people that are engaged in these types of activities involving firearms and narcotics usually keep fruits of these crimes or evidence of these crimes at their place of residence or where they spend most of their time." (Hr'g Tr. 125.) Because the warrant affidavit established probable cause that Defendant possessed firearms illegally, it follows that probable cause existed to search what was known to be his residence, because "people generally keep [firearms] at home or on their persons." *United States v. Cowling,* 648 F.3d 690, 696 (8th Cir. 2011) (quotations omitted); *United States v. Keele*, 589 F.3d 940, 943–44 (8th Cir. 2009) (holding that an agent's affidavit explaining their experience with how people utilize their residences for illicit behavior was sufficient for a nexus after knowing that Defendant was engaged in some illegal activity); *see also United States v. Huntington*, No. 20-cr-145 (ECT/BRT), 2021 WL 165112, at *2 (D. Minn. Jan. 19, 2021) (citing *Cowling*, 648 F.3d at 696) ("Thus, when the government has shown probable cause that a defendant illegally possessed a firearm, that showing naturally extends to his residence."); *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988) ("It was reasonable for the magistrate to believe that the defendant's gun and the silencer would be found in his residence . . . . even though the affidavit contained no facts that the weapons were located in the defendant's trailer . . .").

12

This Court concludes that the statements made in the affidavit about Defendant living at the Euclid address were not untruthful or recklessly made; therefore, they permissibly allowed a judicial officer to draw inferences about where Defendant's primary residence would have been, and therefore, where Defendant likely would store weapons or narcotics. Therefore, the warrant application provides the required nexus and is supported by probable cause.

### III.   *Leon* Exception

Finally, even if probable cause did not exist, as explained above there was no *Franks* violation and this was a facially valid warrant, and therefore the good-faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), would have to be considered. "Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted). Here, this Court concludes that the good-faith exception would apply to the search warrant for the Euclid address. There is no

evidence to suggest that the officers' reliance on the warrant was not in good faith, nor is there evidence that the officers' reliance was not reasonable. For these reasons, this Court concludes that the evidence seized as a result of the execution of the search warrant should not be suppressed and Defendant's motion should be denied.

## RECOMMENDATION

Based on the file, record, and proceedings herein, and for the reasons stated above,

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 17) be **DENIED**.

Date: August 11, 2021

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **August 25, 2021**. A party may respond to those objections by **September 8, 2021**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.